**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-14-CR-02017(1)-KC** |
| | § | |
| **FELICIA WALLER,** | § | |
| | § | |
| **Defendant**. | § | |

**ORDER**

On this day, the Court considered Defendant Felicia Waller's ("Defendant") Motion to

Suppress Illegally Obtained Evidence and Memorandum in Support (the "Motion"), ECF No. 23,

in the above-captioned case (the "Case"). For the reasons set forth below, the Court **GRANTS**

the Motion.

**I.      BACKGROUND**

On the afternoon of September 25, 2014, El Paso Police Department ("EPPD") Officers

Edward Granados and Thomas Ibarra stopped a white SUV traveling in northeast El Paso, Texas,

allegedly on the basis of two traffic violations. What followed is subject to significant dispute

between the parties; however, it is clear that at some point during the stop, Defendant, who was a

passenger in the SUV, provided her oral and written consent to search her residence on

Texarkana Place (the "Texarkana Home") in connection with an ongoing EPPD narcotics

investigation. While the search of the Texarkana Home did not yield narcotics, it did yield

ammunition, which Defendant was not permitted to possess in light of her prior felony

conviction.

Shortly thereafter, on November 5, 2014, a grand jury returned a one-count indictment

against Defendant charging her with being a felon in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1).  *See* Indictment 1, ECF No. 1.  Defendant filed the Motion on February 18, 2015, and the government filed its Response to Defendant's Motion to Suppress ("Response"), ECF No. 26, on March 2, 2015.

After reviewing both the Motion and the Response, the Court set the matter for an evidentiary hearing on April 8, 2015.  *See* Notice of Hr'g, ECF No. 29.  During the evidentiary hearing, the Court heard testimony from four witnesses.  The Court first recounts the testimony of the government's witnesses, and then discusses the testimony of the SUV's two occupants – Defendant, and her cousin, Adrienna Waller ("Adrienna").

### A.     Testimony of Government Witnesses

Officer Granados was the first witness to testify at the evidentiary hearing, and provided the vast majority of the facts that form the basis of the government's version of what occurred on September 25, 2014.

As an initial matter, Officer Granados explained that he and his partner, Officer Ibarra, are part of the EPPD's Tactical, Apprehension, and Control ("TAC") unit.  Apr. 8, 2015, H'rg Tr. 29 ("Transcript"), ECF No. 40.  According to Officer Granados, the TAC unit is tasked with investigating major crimes in the El Paso area, such as assaults, burglaries, and robberies.  *Id.* at 29, 56.  However, on September 25, 2014, Officer Granados testified that he and Office Ibarra "didn't have any cases," and were therefore instructed to "do some traffic enforcement in areas where [the EPPD was] getting hit with burglaries and robberies, as kind of like a crime deterrent."  *Id.* at 58.  As a result, Officer Granados testified that he and his partner were "just cruising around, checking to see if everybody [was obeying] the traffic laws."  *Id.* at 8.

At some point during their patrol, Officer Granados and Officer Ibarra observed a white

SUV traveling northbound on Dyer Street.  *Id.*  According to Officer Granados, the vehicle was traveling eight miles per hour over the posted speed limit, and the driver was talking on her cell phone.  *Id.* at 8-9.  As a result, the officers turned on their lights and siren, and initiated a traffic stop.  *Id.* at 9-10; *see also id.* at 29-30.

The white SUV responded to the officers' signals and slowly pulled into a nearby parking lot.  *Id.* at 10, 64.  Upon exiting their police cruiser, Officer Granados and Officer Ibarra learned that there were two occupants in the vehicle:  Defendant, who was sitting in the front passenger's seat, and Adrienna, who was sitting in the driver's seat.  *Id.* at 10-11.  According to Officer Granados, he recognized Adrienna immediately because he and Officer Ibarra had stopped her for traffic violations in the past, including most recently "two or three nights before this stop." *Id.* at 30-31.  Because of these prior encounters, the officers were also aware that Adrienna had several outstanding traffic warrants.  *Id.* at 31, 33, 55.

Once the officers arrived at the vehicle, they asked both Adrienna and Defendant for their driver's licenses.  *Id.* at 11-12, 39.  In addition, after Defendant advised Officer Granados that the SUV was registered under her name, the officers also requested Defendant's proof of insurance.  *Id.* at 11-12.  Defendant and Adrienna provided the officers with these documents, which Officer Granados testified were valid and up to date.  *Id.* at 11-12, 39-40.

Officer Granados characterized Defendant's demeanor during the traffic stop as "cooperative."  *Id.* at 12.  However, he also stated that she "seemed agitated" and was "muttering under her breath."  *Id.*  When he asked Defendant what exactly was bothering her, Defendant purportedly responded that the two officers were "messing with her," and that "she was tired of being harassed by us."  *Id.* at 13.  Specifically, Defendant indicated that the police officers "were following her" because "someone had thrown her name out in the streets."  *Id.*  According to

Officer Granados, he understood this last reference to mean that Defendant was under the impression that she had been implicated "as someone who is dealing drugs." *Id.*

During his testimony, Officer Granados initially claimed that he was surprised by Defendant's statements because he had never met her before and did not know who she was. *Id.* at 13, 36. However, he later testified on cross examination that during a briefing "several days before" the September 25, 2014, traffic stop, EPPD narcotics detectives had identified Defendant and the Texarkana Home as the primary target of an ongoing narcotics investigation. *See id.* at 37-38. He further testified that he had personally located narcotics while conducting traffic stops of vehicles leaving the Texarkana Home, and allegedly obtained sworn statements from certain individuals naming Defendant as a person involved in narcotics trafficking. *Id.* at 47-48. Nevertheless, Officer Granados expressly denied that the traffic stop was in any way connected to EPPD's suspicions that Defendant was involved with narcotics dealing, *id.* at 37, and even stated that he did not realize who Defendant was until he saw the Texarkana Home listed as the address on her insurance information. *Id.* at 14, 54.

The remainder of the exchange between Officer Granados and Defendant is subject to significant dispute between the parties. According to Officer Granados, when he continued to claim that he "didn't know who [Defendant] was," Defendant allegedly responded that he "was lying" and that he "knew exactly who she was" and "what she was talking about." *Id.* at 14-15. Officer Granados then claimed that within three to five minutes of initially stopping Defendant's vehicle, Defendant provided him with a spontaneous and unsolicited consent to search the Texarkana Home:

> [S]he told me that she was tired of getting messed with. She wants to clear her name. So she said let's go to her house and we can search her house so that she can clear her name.

*Id.* at 15.

4

Before accepting Defendant's offer, Officer Granados testified that he made two phone calls. *Id.* at 16.  First, he called his EPPD sergeant, who gave him permission to go forward with the consent search. *Id.* at 16-17.  Second, he called the narcotics detective that was in charge of the investigation of the Texarkana Home. *Id.* at 16.  According to Officer Granados, he knew to call the narcotics detective because his supervisors "had earlier briefed us that [the Texarkana Home] was a house that they were watching for narcotics activity." *Id.*  Though Officer Granados was able to speak with his sergeant immediately, "approximately 10 to 15 minutes [elapsed] before the narcotics detective returned [his] phone call." *Id.*

While Officer Granados was making these two phone calls, two additional EPPD vehicles arrived on the scene of the traffic stop. *Id.* at 19-20, 43-45.  One of those vehicles belonged to the only other TAC unit that was on duty that afternoon – namely, Officer Ramos and Officer St. Lewis. *See id.* at 19-20, 64, 69.  According to Officer St. Lewis, who also testified at the evidentiary hearing, it took him and Officer Ramos approximately ten to fifteen minutes to drive to the scene of the traffic stop after Officer Ibarra and Officer Granados requested their assistance. *Id.* at 64.  As the only female officer on the scene, Officer Ramos conducted a pat-down search of both Adrienna and Defendant shortly after she arrived. *Id.* at 19-20, 80.  Officer Granados then sent Officer St. Lewis and Officer Ramos ahead to the Texarkana Home in order to "secure the exterior of [Defendant's] residence" and "make sure no one goes in and no one comes out." *See id.* at 69; *see also id.* at 45, 78.

Once Officer Granados received permission from his sergeant and the narcotics detective to proceed, he retrieved a consent-to-search form from the trunk of his police cruiser, and asked Defendant whether she was still willing to allow EPPD to search the Texarkana Home. *Id.* at 17-18.  Defendant indicated that she was, and signed the consent-to-search form. *Id.* at 17-19.

According to Officer Granados, he then instructed Defendant and Adrienna to drive their own vehicle to the Texarkana Home, and explained to them that he and Officer Ibarra would follow in their police cruiser. *Id.* at 20-21.

Officer Granados testified that the entire traffic stop lasted approximately thirty to forty minutes. *Id.* at 21. Despite the fact that the officers initiated the stop because Adrienna was allegedly speeding and talking on her cell phone while driving, Officer Granados testified that neither he nor his partner ever requested to inspect Adrienna's cell phone to confirm whether or not it was in use prior to the stop, *id.* at 53, nor did they issue Adrienna a traffic citation. *Id.* at 33. In addition, though Adrienna had outstanding traffic warrants, the officers did not arrest her on the basis of those warrants. *Id.*

According to Officer Granados, it took them approximately five to seven minutes to drive from the scene of the traffic stop to the Texarkana Home. *Id.* at 21. After Defendant, Adrienna, and the EPPD officers had all arrived, Officer Granados testified that he asked Defendant "one more time if she was sure that [the EPPD officers] could search the house." *Id.* at 22. Officer Granados further claims that he "advised [Defendant] that she could still say no, [and] that this was completely voluntary." *Id.*; *see also id.* at 72. According to Officer Granados, Defendant responded that she "'just want[ed] to get this over with.'" *Id.* at 22. Accordingly, Defendant entered the Texarkana Home, removed her dog, and allowed five EPPD officers to search her residence "from room to room." *Id.* at 22-23.

At some point during the search, Officer Granados testified that he received a phone call from Agent Fleming of the Bureau of Alcohol, Tobacco, Firearms and Explosives. *Id.* at 26, 58-59. Agent Fleming informed Officer Granados that Defendant was "possibly a convicted felon." *Id.* at 26. Shortly after receiving this phone call, Officer Granados discovered several rounds of

nine millimeter ammunition and shotgun shells in Defendant's bedroom.  *Id.* at 23-24.  When asked about the ammunition, Defendant explained that it was indeed hers, and that she would occasionally go to shooting ranges with friends.  *Id.* at 24, 74.  Defendant also admitted that she had in the past been convicted of a felony.  *Id.* at 26.  When Officer Granados continued to inquire into the circumstances surrounding the ammunition, Defendant allegedly responded, "'Geez, what's the big deal?  Can I not have ammunition or something?'"  *Id.* at 25.  Because of Defendant's prior felony conviction, Officer Granados seized the ammunition and eventually transferred it over to Agent Fleming's custody.  *Id.* at 25-28.

According to Officer Granados and Officer St. Lewis, the search of Defendant's residence lasted approximately two to three hours.  *Id.* at 50-51, 76-77.  While Officer Granados testified that the only items that the EPPD seized during the search were the nine millimeter ammunition and the shotgun shells, *see id.* at 24-27, 51-52, Officer St. Lewis testified that it was his understanding that Officer Granados also personally seized a "Bi-Lo" or "Arizona" screw can with narcotics residue somewhere in the Texarkana Home.  *Id.* at 73-74.  There is no indication that this screw can belonged to Defendant, nor was Defendant ever charged with a narcotics offense in connection with the September 25, 2014, search of the Texarkana Home.  In addition, Officer Granados's seizure of the screw can was not documented on the copy of the police report that was provided to Defendant.  *Id.* at 79-80.

**B.     Testimony of Defense Witnesses**

As noted above, both Adrienna and Defendant also testified at the April 8, 2015, evidentiary hearing.  They provided a starkly different account of the events surrounding the EPPD's September 25, 2014, traffic stop and subsequent search of the Texarkana Home.

As an initial matter, Adrienna testified that the September 25, 2014, traffic stop marked

the *fourth* occasion in a span of a week that these same four TAC officers[1] had stopped her

vehicle on the way to or from the Texarkana Home.[2]  *Id.* at 87-89, 103-04, 112.  The first time

the TAC officers stopped her vehicle, they did so allegedly because her "muffler was hanging."

*Id.* at 89, 104.  However, once these TAC officers discovered that she had outstanding traffic

warrants, they used this fact as a justification to stop her vehicle three additional times that same

week:

> The second time they told me I had warrants.  The third time they
> told me I had warrants.  And the fourth time when they pulled me
> over, they said they pulled me over because they knew I had
> warrants and they wanted to search the car.

*Id.* at 90.[3]

Despite the fact that the TAC officers repeatedly stopped Adrienna on the basis of her

outstanding warrants, Adrienna testified that they never once took her into custody.  *Id.* at 90-91,

100, 111.  Nor did they ever issue her a single traffic citation.  *Id.* at 100, 108.  Instead, each time

they initiated a stop, Adrienna testified that the officers would search her person and her vehicle,

and upon finding no evidence of illegal activity, allow her to go on her way.  *Id.* at 98, 109.

However, according to Adrienna, the September 25, 2014, stop was unique in that it was the first

time she was stopped with Defendant also present in the vehicle.  *Id.* at 108, 122-23.

After discussing her history with the various TAC officers, Adrienna testified regarding

her recollection of the September 25, 2014, traffic stop specifically.  According to Adrienna, the

---

[1] Adrienna clarified that the four TAC officers she was referring to were Officer Granados, Officer Ibarra, Officer
Ramos, and Officer St. Lewis.  Tr. 87-89.  According to Adrienna, two of these previous stops were initiated by
Officer Granados and Officer Ibarra, and the third stop was initiated by Officer St. Lewis and Officer Ramos.  *Id.* at
103-04.  Adrienna testified that these same officers had stopped her vehicle so often that by September 25, 2014, she
knew them by name.  *Id.* at 89.

[2] According to Adrienna, while she has since moved to a different address, she was living with Defendant in the
Texarkana Home during the time period relevant to the instant Motion.  Tr. 101.

[3] Adrienna explained that her outstanding warrants were for driving with an expired registration sticker, driving with
an expired inspection sticker, and speeding.  Tr. 90-91.

sole justification the officers provided for the stop was that "they knew [Adrienna] had warrants and they wanted to search the car." *Id.* at 90; *see also id.* at 91, 105.  There was no mention of speeding and no mention of Adrienna talking on her cell phone.  *Id.* at 106.  In any event, Adrienna was adamant that she had committed neither traffic violation at the time that Officer Granados and Officer Ibarra stopped her vehicle.  *Id.* at 86.

Adrienna testified that the September 25, 2014, stop began in the same manner as the preceding three stops:  the officers collected her driver's license and insurance information, conducted a pat-down search of Adrienna's and Defendant's person, and searched the vehicle for contraband.  *Id.* at 92, 106-07, 114.[4]  However, unlike the previous three instances when TAC officers searched Adrienna and her vehicle and discovered no evidence of wrongdoing, Adrienna testified that, on this occasion, Officer Granados and Officer Ibarra continued to detain both her and Defendant at the scene of the stop.  *See id.* at 92, 122.

According to Adrienna, Officer Granados and Officer Ibarra initially spoke to Defendant in private, *see id.* at 92-93, 107, 110-11, 114,  but then explained to both her and Defendant that if they consented to a search of the Texarkana Home, "the harassment would stop."  *Id.* at 113; *see also id.* at 124-25.  Specifically, Adrienna recalled one of the officers stating, "'if you guys let us search the house, we'll leave you all alone.'"  *Id.* at 126.  Because, in Adrienna's words, she and Defendant "weren't doing anything wrong," both of them signed the consent-to-search form.  *Id.* at 96; *see also id.* at 92-94, 112-14.  In total, Adrienna estimated that the stop lasted approximately one hour.  *Id.* at 94-95, 120-21.

As mentioned above, Defendant also testified at the evidentiary hearing.  *See id.* at 129-74.  While her testimony largely comports with that of her cousin, Defendant did provide some

---

[4] It bears noting that Officer Granados was insistent during his testimony that neither he nor Officer Ibarra searched the vehicle on September 25, 2014.  *See* Tr. 35.

additional details that are relevant to the resolution of the Motion.  According to Defendant, after

Officer Granados retrieved her driver's license and insurance information, he briefly stepped

away from the vehicle to make a phone call.  *Id.* at 135, 150-51.  When he returned, he asked

Defendant to step out of the SUV, and attempted in private to convince Defendant that she

should consent to a search of the Texarkana Home.  *Id.* at 136.  Specifically, Officer Granados

claimed that several people in Defendant's neighborhood had mentioned her as someone who

was selling drugs.  *Id.* at 168-69.  He further claimed to have "a list of houses" that he and the

other TAC officers were investigating for narcotics, and stated that if Defendant agreed to a

search of the Texarkana Home, he could "'take [Defendant's] name off the list and move on to

another house.'"  *Id.* at 139; *see also id.* at 153, 168-69.  Defendant recalled a portion of her

conversation with Officer Granados as follows:

> His exact words [were], "I'm not going to BS you and you're not
> going to BS me. . . .  I know you've seen us around your
> neighborhood. . . .  We can make it all go away if you give us
> permission to go in your house right now.  All I have to do is just
> call my sergeant and say we got the consent."

*Id.* at 135-36; *see also id.* at 168-69.

At this point, Defendant recalled being frustrated, upset, and "embarrassed that [she was]

in the middle of the street for nothing."  *Id.* at 156; *see also id.* at 147, 152-53.  As a result, she

told Officer Granados, somewhat sarcastically, that he could "'[s]earch my car, search me,

search my house, I don't care.  Just . . . leave me alone.'"  *Id.* at 138; *see also id.* at 153, 169-70.

Though Defendant claimed that she was surprised that the officers took this statement seriously,

she nonetheless signed the consent-to-search form because she "had nothing to hide" and wanted

"to cooperate as much as possible."  *Id.* at 156; *see also id.* at 147.  Like her cousin, Defendant

also estimated that the entire stop lasted "a good hour."  *Id.* at 140.

According to Defendant, after she and Adrienna signed the consent-to-search form,

Officer Granados initially attempted to convince her to ride in the back of the police cruiser on the way to the Texarkana Home. *Id.* at 140-42. Defendant testified that "the only way they would let me drive myself to my location" was if both she and Adrienna put their cell phones in the trunk of a vehicle.[5] *Id.* at 142. Because Defendant did not want to drive with Officer Granados in the police cruiser, she and Adrienna relented, and put their cell phones in a trunk. *Id.* Defendant testified that as she and Adrienna made their way to the Texarkana Home, there was one police car in front of them and another marked unit following them from behind. *Id.* at 142, 146. Defendant further testified that there were three additional police vehicles already at the Texarkana Home awaiting their arrival. *Id.* at 143.

Defendant estimated that EPPD's search of the Texarkana Home took approximately three hours. *Id.* at 144-45. After the search was well underway, and as it began to get dark outside, Defendant received several phone calls from her spouse explaining that she needed to pick up their children. *Id.* at 174. Defendant testified that her children also called her directly, and told her that they were ready to be picked up. *Id.* at 145. Because Defendant did not want to leave the Texarkana Home while the police were still searching, she testified that she repeatedly asked the officers to finish their search so that she could leave the residence. *Id.* at 145, 174. Defendant recalled that, at one point, she told the officers, "'Look, I need y'all to be done because I need to go pick up my kids." *Id.* at 174. According to Defendant, she made this statement before the officers recovered the ammunition from her room. *Id.* at 145. However, each time she told the officers that they needed to leave the Texarkana Home, they responded that they were "'almost done,'" and continued to search. *Id.* at 145, 174. Although she was scheduled to pick up her children at 7:30 p.m., Defendant testified that the officers did not leave

---

[5] The Court observes that it is not clear from Defendant's testimony whether Officer Granados required Defendant and Adrienna to place their cell phones in the trunk of their SUV, or in the trunk of one of the two police cruisers at the scene of the stop. *See* Tr. 120, 142.

the Texarkana Home until sometime after 9:00 p.m.  *Id.* at 145, 173-74.  Accordingly, Defendant

was several hours late in picking up her children.  *Id.* at 145.

## II.    DISCUSSION

### A.    Standard

The Fourth Amendment protects individuals from unreasonable searches and seizures.

U.S. Const. amend. IV; *United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003).  Because a

traffic stop is considered a "seizure" within the meaning of the Fourth Amendment, it is "subject

to the constitutional imperative that it not be 'unreasonable' under the circumstances."  *Whren v.*

*United States*, 517 U.S. 806, 810 (1996).  To determine whether the police conducted a traffic

stop within the confines of the Fourth Amendment, courts apply the standard set forth in *Terry v.*

*Ohio*, 392 U.S. 1 (1968).  *See, e.g.*, *Grant*, 349 F.3d at 196 (citing *Berkemer v. McCarty*, 468

U.S. 420, 439 (1984)); *see also United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013).

The *Terry* framework requires a two-step inquiry.  First, the court must determine

"whether or not the officer's decision to stop the vehicle was justified at its inception."  *United*

*States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010) (citing *United States v. Brigham*, 382 F.3d 500,

506 (5th Cir. 2004)).  This means that "an officer must have an objectively reasonable suspicion

that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before

stopping the vehicle."  *United States v. Banuelos-Romero*, 597 F.3d 763, 766 (5th Cir. 2010)

(internal quotation marks and citation omitted).  Second, the Court examines "whether or not the

officer's subsequent actions were reasonably related in scope to the circumstances that caused

him to stop the vehicle in the first place."  *Pack*, 612 F.3d at 350 (citing *Brigham*, 382 F.3d at

506).

As the Supreme Court recently had occasion to reaffirm, "a police stop exceeding the

time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. United States*, --- U.S. ----, 135 S. Ct. 1609, 2015 WL 1780927, at *3 (Apr. 21, 2015). Accordingly, "[a] seizure justified only by a police-observed traffic violation . . . becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation." *Id.* (internal quotation marks and citation omitted, alterations removed); *see also Brigham*, 382 F.3d at 507 ("[A] detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges.").

Where, as in this Case, the government searches or seizes a defendant without a warrant, "the government bears the burden of proving, by a preponderance of the evidence, that the search or seizure was constitutional." *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001); *see also United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005); *United States v. Hidalgo*, 385 F. App'x 372, 375-76 (5th Cir. 2010). Similarly, when the government conducts a search on the basis of consent, it "has the burden of proving, by a preponderance of the evidence, that the consent was voluntary." *United States v. Shabazz*, 993 F.2d 431, 438 (5th Cir. 1993) (internal quotation marks and citation omitted). "It is clear that credibility determinations and the resolution of conflicting testimony at a suppression hearing are the responsibility of the district court as trier of fact." *United States v. Turner*, 628 F.2d 461, 465 (5th Cir. 1980); *accord United States v. Martinez*, 537 F. App'x 340, 343 (5th Cir. 2013).

## B. The Initial Stop

The first issue the Court considers is whether Officer Granados and Officer Ibarra had the requisite reasonable suspicion to stop Defendant's vehicle on September 25, 2014.[6] According

---

[6] Although Defendant initially elected not to contest the first prong of the *Terry* analysis in her Motion, *see* Mot. 5, her concession stemmed from the fact that the Motion was conceived using only the facts contained within the

to Officer Granados, he and Officer Ibarra initiated the traffic stop because they observed the SUV speeding, and its driver illegally using her cell phone. *See* Tr. 8-9, 29-30, 53. Adrienna expressly denied committing either of these traffic violations, *id.* at 86, and further testified that the officers never mentioned her speed or her use of a cell phone when they pulled her over on September 25, 2014. *Id.* at 90-91, 104-06. Defendant testified likewise, indicating that the only justification for the stop that the officers provided them at the scene was that they knew Adrienna had outstanding traffic warrants and they wanted to search the vehicle. *Id.* at 134, 149, 170, 173.

It is well settled that the constitutionality of a traffic stop does not turn on the subjective motivations of the individual officers involved. *Whren*, 517 U.S. at 813. Indeed, "[s]o long as a traffic law infraction that would have objectively justified the stop had taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment." *Goodwin v. Johnson*, 132 F.3d 162, 173 (5th Cir. 1997), *abrogated on other grounds by Smith v. Robbins*, 528 U.S. 259 (2000); *see also United States v. Cole*, 444 F.3d 688, 689 (5th Cir. 2006) ("The rule established by the Supreme Court in *Whren* allows officers to justify a stop by the occurrence of a traffic violation even though this is not the real reason for the stop."). Still, a pretextual stop becomes illegal when the officer's stated justification is not "objectively grounded." *Cole*, 444 F.3d at 689 (citing *United States v. Miller*, 146 F.3d 274, 279 (5th Cir. 1998)).

Because the Court received conflicting testimony on whether Adrienna was operating the vehicle in compliance with Texas law, the Court's resolution of the first step of the *Terry* analysis necessarily requires a credibility determination. *See Turner*, 628 F.2d at 465. In this vein, the Court finds Adrienna's and Defendant's testimony to be more credible than that of

---

EPPD police report. *See id.* at 2. Because the facts that emerged during the evidentiary hearing cast the veracity of that information into serious doubt, and because of the importance of the constitutional rights at issue here, the Court in its discretion elects not to hold Defendant to this concession for the purposes of the Motion.

Officer Granados's for several reasons.  As an initial matter, the uncontradicted evidence at the hearing establishes that the September 25, 2014, traffic stop was the fourth occasion in a span of a week that a team of TAC officers stopped Adrienna's vehicle.  *See* Tr. 87-90, 103-04.  Indeed, Officer Granados admitted that he personally stopped Adrienna "maybe two or three nights before" September 25, 2014, *see id.* at 30-33, 55, and Officer St. Lewis testified without elaboration that he recognized Adrienna from "traffic stops."  *Id.* at 79.  Given that Adrienna had already been stopped three times by EPPD that week, the Court doubts that she was operating the SUV on September 25, 2014, in blatant violation of several Texas traffic ordinances.  Instead, the Court finds it more likely that Officer Granados and Officer Ibarra stopped the SUV on September 25, 2014, solely based on their desire to further their ongoing narcotics investigation.[7] This conclusion is consistent with the fact that on all four occasions that the TAC officers detained Adrienna under the guise of a traffic stop, they never once issued her a single citation. *See id.* at 100, 108.

In addition to the suspicious circumstances surrounding the September 25, 2014, stop, the Court also notes that it found Officer Granados's testimony to be evasive on several material issues.  For example, while Officer Granados claimed that he and Officer Ibarra were merely conducting routine traffic enforcement on September 25, 2014, *id.* at 8, 58, the TAC unit to which he and Officer Ibarra belong is responsible for investigating major crimes in the El Paso area, *id.* at 29, 56, not "cruising around, checking to see if everybody [was obeying] the traffic laws."  *Id.* at 8.  Moreover, while Officer Granados initially represented that he did not know who Defendant was until he saw the Texarkana Home listed on her insurance information, *see id.*

---

[7] Indeed, while the credible evidence in the record establishes that Officer Granados requested to search Defendant's house during the traffic stop, he conceded in response to the Court's questions that he never requested to inspect Adrienna's cell phone, despite the fact that Adrienna's use of the phone was one of the justifications for the stop in the first instance.  *See* Tr. 53.

at 13-14, he later testified on cross examination that narcotics detectives told him several days

prior to the traffic stop that Defendant "was a target of a narcotics investigation." *Id.* at 37.

Thus, at bottom, Officer Granados's testimony is that two TAC officers who were conducting

routine "traffic enforcement" because they "didn't have any cases that particular week," *id.* at 58,

randomly stopped a vehicle whose passenger happened to be the primary target of an EPPD

narcotics investigation, and whose driver they were already familiar with because they had

stopped her two or three times previously that same week, including "maybe two or three nights

before" September 25, 2014. *Id.* at 30-33. In short, the Court is of the opinion that this

testimony is disingenuous at best. And, although it is not illegal to conduct a pretextual traffic

stop, *see Wren*, 517 U.S. at 813, Officer Granados's lack of candor undermines the veracity of

his testimony as a whole, including his representations that Adrienna was speeding and using her

cell phone at the time of the stop.[8] *See Turner*, 628 F.2d at 465.

Finally, the fact that Adrienna had outstanding traffic warrants does not automatically

render the traffic stop constitutional. While police officers may undoubtedly stop a vehicle

based on their reasonable suspicion that the driver has outstanding traffic warrants, *see, e.g.*,

*United States v. Wheeler*, 145 F. App'x 894, 895 (5th Cir. 2005), here, Officer Granados himself

testified that the only justifications for the stop were speeding and the driver's illegal use of a

cell phone. *See* Tr. 8-9, 29-30, 53. Indeed, according to Officer Granados, he and his partner did

not recognize Adrienna as the driver of the SUV until *after* they had already initiated the traffic

stop and exited their police cruiser. *See id.* at 30. As a result, Adrienna's outstanding traffic

warrants could not serve as an independent justification for the September 25, 2014, stop.

---

[8] Officer Granados's explanation for the September 25, 2014, traffic stop was not the only portion of his testimony that this Court found not credible. As just one additional example, while Officer Granados testified that the only items EPPD recovered from the search of the Texarkana Home were nine millimeter ammunition and shotgun shells, *see* Tr. 24-27, Officer St. Lewis later testified that Officer Granados personally seized a screw can with narcotics residue, which he did not list on the police report. *Id.* at 73-74.

In sum, because the Court credits Adrienna's testimony that she was neither speeding nor talking on her cell phone at the time of the stop, *see Turner*, 628 F.2d at 465, and because the officers claim not to have recognized Adrienna as the driver of the SUV until after they stopped the vehicle, the Court finds that the officers lacked an objectively reasonable basis to stop the SUV on September 25, 2014. *See Cole*, 444 F.3d at 689. Without an objectively reasonable basis to initiate the traffic stop, Defendant's detention was unlawful. *See id.*

### C.     Continued Detention

The Court's conclusion that the traffic stop was unlawful at its inception is sufficient to render the entire stop unreasonable under the Fourth Amendment. *See Brigham*, 382 F.3d at 506. However, even if the government could establish an "objectively grounded" basis for stopping Defendant's vehicle, the TAC officers' flagrant misuse of the traffic stop as a means to extract Defendant's consent to search the Texarkana Home constitutes an independent Fourth Amendment violation.

As noted above, "a detention [in connection with a traffic stop] must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *Id.* at 507. Thus, "[i]f an officer can complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete the stop's mission.'" *Rodriguez*, 2015 WL 1780927, at *7 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)) (internal alterations removed). The Fourth Amendment does not recognize "bonus time to pursue an unrelated criminal investigation." *Id.*

Here, Officer Granados's testimony walks the line of this standard a bit too carefully. In particular, he claims that "within three to five minutes" of initiating the traffic stop, and while he and Officer Ibarra were still making routine traffic inquiries, Defendant began making

spontaneous statements regarding her false reputation as a narcotics trafficker.  *See* Tr. 11-15, 21.

Officer Granados then claims that, without any prompting from him or his partner, Defendant

offered to accompany the officers to the Texarkana Home and allow them to enter and search her

residence for narcotics.  *Id.* at 15.  Thus, the government argues, because Defendant voluntarily

provided Officer Granados with her unsolicited consent to search the Texarkana Home before

the traffic stop had reached its natural conclusion, the extension of the stop was one of

Defendant's own making, and therefore reasonable under the Fourth Amendment.  *See* Resp. 6.

      The problem with the government's argument is that the Court does not believe that this

is what actually occurred on September 25, 2014.  Instead, the Court finds Defendant's version

of events significantly more plausible, and her testimony more credible.  That is, that after

conducting approximately ten minutes of routine traffic inquiries, Officer Granados took

Defendant aside and explained that her name had been mentioned "on the streets" as someone

who was engaged in narcotics trafficking, and that if she truly had nothing to hide, she would

consent to a search of the Texarkana Home so that EPPD could "take her off [their] list."  *See* Tr.

169; *see also id.* at 139-40, 153, 157-58.

      Given the Court's conclusion, it is clear that even if Officer Granados and Officer Ibarra

had actually observed Adrienna committing some sort of traffic offense, their subsequent actions

"prolonged [the stop] beyond the time reasonably required to complete the mission of issuing a

ticket for the violation."  *See Rodriguez*, 2015 WL 1780927, at *3 (internal quotation marks and

citation omitted, alterations removed).  In *Rodriguez*, the Supreme Court made clear that an

officer's "mission" during a valid traffic stop is typically limited to "checking the driver's

license, determining whether there are outstanding warrants against the driver, and inspecting the

automobile's registration and proof of insurance."  *Id.* at *6; *see also, e.g.*, *Brigham*, 382 F.3d at

507-08.  Here, there is no indication that Officer Granados or Officer Ibarra even attempted to run Adrienna's license through their computer system, which is unsurprising given that the officers had already determined "two or three nights before" that she had outstanding traffic warrants.  *See* Tr. 30-31.  Thus, once Officer Granados reviewed Adrienna's and Defendant's documentation and found it, in his words, "valid," *see id.* at 40, the only remaining actions consistent with the stop's mission were to issue Adrienna a traffic citation and/or to take her into custody for the outstanding warrants, neither of which he had done on the two or three prior occasions he had stopped Adrienna's vehicle that week.  However, instead of simply terminating the stop, as these officers had done several times previously, Officer Granados and Officer Ibarra continued to detain Adrienna and Defendant until they both consented to a search of the Texarkana Home.  In doing so, the officers "exceed[ed] the time needed to handle the matter for which the stop was made," and therefore violated "the Constitution's shield against unreasonable seizures."  *See id.* at *3.[9]

### D.  The Invalidity of Defendant's Consent

Having concluded that Defendant's Fourth Amendment rights were violated, the Court must now determine whether Defendant's consent "cured any Fourth Amendment problem." *United States v. Jenson*, 462 F.3d 399, 406 (5th Cir. 2006).  In certain instances, a defendant's consent may "dissipate the taint of a fourth amendment violation," and thus obviate the need to suppress any evidence obtained from the resulting search.  *United States v. Chavez-Villarreal*, 3

---

[9] It bears noting that the government does not advance any argument, nor can the Court discern any from the credible testimony in the record, that Defendant or Adrienna did or said anything during the stop that could justify prolonging their detention beyond the time necessary to issue a traffic citation.  *Cf. Brigham*, 382 F.3d at 509 (upholding a prolonged detention where certain discrepancies in the vehicle's rental documents gave rise "to a reasonable suspicion that, at the very least, the vehicle might have been stolen").  Moreover, to the extent Officer Granados's prior knowledge regarding the EPPD's ongoing narcotics investigation provided an independent basis for further inquiry, his suspicions should reasonably have been dispelled after the officers searched Defendant's vehicle and person, and did not find any narcotics or other evidence of wrongdoing.  *See United States v. Santiago*, 310 F.3d 336, 339, 342 (5th Cir. 2002) (finding prolonged detention unreasonable where any reasonable suspicion that the officer possessed should have been dispelled when the driver's license cleared during the computer check).

F.3d 124, 127 (5th Cir. 1993).  While the government always bears the burden to prove that a defendant consented, *see Shabazz*, 993 F.2d at 438, that burden "becomes all the more difficult when there has been a prior constitutional violation."  *United States v. Macias*, 658 F.3d 509, 522 (5th Cir. 2011) (internal quotation marks and citation omitted).

In the wake of a Fourth Amendment violation, courts in this Circuit engage in a two-pronged test to determine whether a defendant's consent is valid:  "(1) whether consent was voluntary and (2) whether it was an independent act of free will."  *Jenson*, 462 F.3d at 406 (citing *United States v. Santiago*, 310 F.3d 336, 342 (5th Cir. 2002)).  "The first prong focuses on coercion, the second on causal connection with the constitutional violation."  *Chavez-Villarreal*, 3 F.3d at 127.  "Even though voluntarily given, consent does not remove the taint of an illegal detention if it is the product of that detention and not an independent act of free will."  *Id.* at 127-28.

Because it is clear to this Court that Defendant's consent was a product of her illegal detention, the Court does not reach the issue of whether Defendant's consent was voluntarily given.  *See, e.g.*, *Macias*, 658 F.3d at 523 (declining to decide whether consent was voluntary where "it [was] clear . . . that Macias's consent was too closely connected to the unconstitutional detention to be deemed an independent act of free will"); *United States v. Jones*, 234 F.3d 234, 243 (5th Cir. 2000) (same); *Chavez-Villarreal*, 3 F.3d at 128 (same).  To determine whether a defendant's consent was an independent act of free will, courts consider the following three factors:  "(1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct."  *Chavez-Villarreal*, 3 F.3d at 128.  As explained in detail below, each of these factors weighs decidedly against the government.

First, the evidence adduced at the hearing establishes that the officers obtained Defendant's consent within three to fifteen minutes of illegally stopping the SUV, and in the course of an unconstitutionally prolonged and excessive detention.  *See* Tr. 21, 114-15, 141, 151. This near contemporaneous temporal proximity militates strongly in favor of suppression.  *See Jenson*, 462 F.3d at 407 (holding consent invalid where it was obtained "closely on the heels of the illegal detention"); *Santiago*, 310 F.3d at 343 (holding consent invalid where it was obtained "contemporaneous with the constitutional violation"); *Jones*, 234 F.3d at 243 (finding close temporal proximity where "the detention that became prolonged and unreasonable after the computer checks were completed continued up to the time of [the defendant's] consent").

Second, there were no intervening circumstances separating the officers' Fourth Amendment violations from Defendant's oral or written consent.  While Officer Granados testified that Defendant was "free to leave," Tr. 40, there is no indication that he advised Defendant of this fact prior to obtaining her consent, nor would it be realistic to expect Defendant to simply wander down Dyer Street while her cousin, and her vehicle, were still being detained.  *See Jenson*, 462 F.3d at 407 (noting that a lack of evidence that defendant knew or was told that he was free to leave weighed in favor of suppression); *Santiago*, 310 F.3d at 343 (same). Indeed, contrary to Officer Granados's testimony, the Supreme Court has observed that "even when the wrongdoing is only bad driving, the passenger [in a vehicle subject to a traffic stop] will expect to be subject to some scrutiny, and [her] attempt to leave the scene would be so obviously likely to prompt an objection from the officer that *no passenger would feel free to leave in the first place*."  *See Brendlin v. California*, 551 U.S. 249, 257 (2007) (emphasis added). This observation is all the more true here, where the focus of the stop was almost immediately placed on Defendant, and there were multiple police cruisers at the scene.  *See* Tr. 19-20, 43-45.

The Court also notes that there is no indication that the officers returned Defendant's driver's license and insurance information prior to obtaining her oral or written consent.  *See Jenson*, 462 F.3d at 407 (noting that the return of an occupant's driver's license could be viewed as an intervening circumstance, and a lack of evidence on this point weighs against the government); *Santiago*, 310 F.3d at 343 (same).  Under these facts, "any reasonable passenger would have understood the police officers to be exercising control to the point that no one in the car was free to depart without police permission."  *See Brendlin*, 551 U.S. at 257.

While the government contends that the ten-minute drive from the Dyer Street location to the Texarkana Home constitutes "a clear break in the chain of events," *see* Resp. 8, this argument rings hollow because Defendant had already provided both her oral and written consent to search at the scene of the stop.  Moreover, though the government makes much of the fact that Defendant was permitted to drive her own vehicle to the Texarkana Home, the record evidence establishes that Defendant and Adrienna were literally escorted to their residence by two marked police cruisers, *see* Tr. 115, 142-43, 146, and were even required to place their cell phones in the trunk of a vehicle before departing.  *Id.* at 120, 141-42.  Once they arrived, they discovered three additional police cruisers parked outside the Texarkana Home without their knowledge or consent.  *See id.* at 96-97, 115, 142-43.  Thus, as evidenced by this extensive police presence, the drive to the Texarkana Home is best understood as a mere *continuation* of the illegal detention, not a "clear break in the chain of events."

Last, the Court addresses the "purpose and flagrancy of the [EPPD's] initial misconduct." *See Chavez-Villarreal*, 3 F.3d at 128.  While this Court is aware that police officers may, and often do, use traffic stops as a basis to pursue their suspicions of unrelated illegal activity, intentionally stopping the same driver four times in a span of a week without ever issuing a

single citation constitutes harassment.  Additionally, using a traffic stop originally initiated on

the basis of speeding and cell phone violations as an opportunity to coerce a driver and passenger

to consent to a warrantless search of their residence constitutes a clear Fourth Amendment

violation, and is precisely the type of police misconduct that the exclusionary rule was designed

to deter.  *See Davis v. United States*, --- U.S. ----, 131 S. Ct. 2419, 2427 (2011) ("When the

police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights,

the deterrent value of exclusion is strong and tends to outweigh the resulting costs.") (internal

quotation marks and citation omitted).

In sum, because all three factors weigh against the government, the Court finds that

Defendant's consent was invalid, and the search of the Texarkana Home was nonconsensual.

*See Jenson*, 462 F.3d at 407; *Santiago*, 310 F.3d at 343; *Jones*, 234 F.3d at 243; *Chavez-*

*Villarreal*, 3 F.3d at 128.

### E.      Withdrawal of Consent

Finally, the Court notes that even if Defendant's consent were valid, EPPD's refusal to

terminate the search after Defendant withdrew her consent constitutes an independent Fourth

Amendment violation warranting suppression.  "A consent which waives Fourth Amendment

rights may be limited, qualified, or withdrawn."  *United States v. Ho*, 94 F.3d 932, 936 n.5 (5th

Cir. 1996).  Indeed, as one district court has observed, "if the police have chosen to search with

consent – rather than with a warrant – the Constitution requires them to comply with any time or

manner limitations imposed by the consenting party."  *United States v. Felix*, 134 F. Supp. 2d

162, 172 (D. Mass. 2001) (citing *Florida v. Jimeno*, 500 U.S. 248, 252 (1991)).  The standard for

measuring the scope of a Defendant's consent is objective; courts must ask:  "[W]hat would the

typical reasonable person have understood by the exchange between the officer and the suspect?"

*Jimeno*, 500 U.S. at 251.

While the Fifth Circuit has had very few occasions to further develop this standard, other Courts of Appeal have held that there are no "magic words" that a defendant must employ to withdraw or limit her consent to search. *See, e.g.*, *United States v. Gray*, 369 F.3d 1024, 1026 (8th Cir. 2004); *see also United States v. $304,980.00 in U.S. Currency*, 732 F.3d 812, 820 (7th Cir. 2013). Nevertheless, a defendant's withdrawal must be clearly communicated to the searching officers in order to be effective, and "police officers do not act unreasonably by failing to halt their search every time a consenting suspect equivocates." *$304,980.00 in U.S. Currency*, 732 F.3d at 820; *see also Gray*, 369 F.3d at 1026 ("[I]ntent to withdraw consent must be made by unequivocal act or statement."); *United States v. Kubbo*, 17 F. App'x 543, 545 (9th Cir. 2001) ("Mere reluctance to a continued search, once an explicit and unambiguous statement of consent has been provided, is not necessarily sufficient to imply a withdrawal [of] such consent.").

Applying these standards here, the Court finds that Defendant withdrew her consent prior to the discovery of the ammunition that forms the basis of the government's prosecution. According to the government's witnesses, the entire search of the Texarkana Home lasted between two and three hours. *See* Tr. 51, 76. Defendant testified that when it began to get dark outside, she received several phone calls from her spouse stating that she needed to pick up their children. *Id.* at 174. While some of Defendant's initial protests may fairly be characterized as equivocal, *see id.* at 145, she testified that once her spouse informed her that if she did not leave soon she was "only going to have [the children] for like an hour or so," she told the EPPD officers: "'Look, I need y'all to be done because I need to go pick up my kids.'" *Id.* at 174. The Court finds that this statement by Defendant was sufficiently clear and unequivocal to withdraw her consent. *See Gray*, 369 F.3d at 1026. Because the Court credits Defendant's testimony that

24

she made this statement *before* the officers discovered the ammunition in her room, Tr. 145, and because the government introduced no evidence to the contrary,[10] the officers' continued warrantless search of the Texarkana Home violated the Fourth Amendment, and therefore serves as an independent ground for suppressing the illegally obtained evidence in this Case.

### F.      Fruit of the Poisonous Tree Doctrine

Under the fruit of the poisonous tree doctrine, "'all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the Government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation.'" *Jones*, 234 F.3d at 243-44 (quoting *United States v. Rivas*, 157 F.3d 364, 368 (5th Cir. 1998)); *see also Jenson*, 462 F.3d at 408.  As noted above, the government has made no such showing here.  As a result, all evidence seized from the government's illegal search, including the nine millimeter ammunition, the shotgun shells, the screw can, and Defendant's incriminating statements made at the Texarkana Home,[11] must be suppressed as fruit of the poisonous tree.

## III.   CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress Illegally Obtained Evidence and Memorandum in Support, ECF No. 23, is **GRANTED** in its entirety.

---

[10] Indeed, Officer Granados's recollection actually substantiates Defendant's testimony on this point.  According to Officer Granados, it was not until "approximately . . . an hour and a half" into the search of the Texarkana Home that he first discovered the ammunition.  *See* Tr. 51.

[11] It is well settled that "verbal evidence which derives so immediately from an unlawful entry . . . is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion."  *Wong Sun v. United States*, 371 U.S. 471, 485 (1963).  As a result, Defendant's statements affirming ownership over the ammunition are also inadmissible in any prosecution.  *See id.*; *see also United States v. Portillo-Aguirre*, 311 F.3d 647, 659 (5th Cir. 2002) (excluding defendant's incriminating statement as fruit of the poisonous tree where his earlier consent to search was found invalid); *Chavez-Villarreal*, 3 F.3d at 128 (suppressing incriminating statements in the wake of an invalid consent to search where "[t]he government . . . advanced no persuasive argument for attenuation with respect to [the] statements and [the court found] none in the record").

**SO ORDERED**.

**SIGNED this 14th day of May, 2015.**

_____
KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE